**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David W. Lyons, | No. CV 05-1231-PHX-MHM |
| Plaintiff, | **ORDER** |
| vs. | |
| Safeway, Inc., | |
| Defendants. | |

Defendant Safeway, Inc., moves for summary judgement pursuant to Federal Rule of Civil Procedure 56 (Dkt. #48). Defendant also moves to strike portions of Plaintiff's Objections and Controverting and Separate Statement of Facts in Support of Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and portions of Plaintiff's affidavit (Dkt. #58). Plaintiff David Lyons opposes these Motions.

Plaintiff moves for leave to file a supplemental affidavit (Dkt. #61). Defendant opposes Plaintiff's Motion for Leave. All three motions were submitted on the papers and are fully briefed. Having considered the parties' papers and the evidence cited therein, the Court issues the following Order.

BACKGROUND

Plaintiff worked for Defendant Safeway, Inc., from 1973 until June 2004. In 1985 Plaintiff began working as a store manager, in the Payson, Arizona Safeway Store. At that

1  time, Plaintiff and his family lived in Payson. In 1999, extenuating circumstances forced
2  Plaintiff to move to Fountain Hills, Arizona. Plaintiff planned to move back to Payson in the
3  future and he commuted to work at the Payson Safeway store. In January 2001, Plaintiff was
4  transferred to the Fountain Hills Safeway Store. On June 1, 2002, while working at the
5  Fountain Hills Safeway Store, Plaintiff moved back to Payson.

6  During his time managing the Fountain Hills Store, Plaintiff experienced a number
7  of performance problems. Specifically, his supervisor Benjamin Peterson was concerned
8  with the Store's customer service scores; "shrinkage," meaning the loss of product; "best
9  ball," meaning the measurable expenses the store is targeted to hit; rates of overtime; and
10 "out-of-stocks," or items that the store does not have on hand. In fact, the Fountain Hills
11 Store customer service ranking was 16th out of 16 stores in Mr. Peterson's district in 2002 –
12 the year Plaintiff served as the Fountain Hills Store manager. Interestingly, the Fountain Hills
13 Store was undergoing an extensive remodeling from the time Plaintiff began managing it
14 until April 2002.

15 On December 15, 2002, Plaintiff was involuntarily transferred from the Fountain Hills
16 Safeway Store to Safeway Store No. 2088 at Tatum and Greenway. Plaintiff's supervisor Mr.
17 Peterson told Plaintiff that the reason he was transferred was due to his poor performance.
18 Plaintiff asserts that Store No. 2088 was considered the worst in the district and that Safeway
19 was considering closing the store because it was opening a new store nearby. Of note,
20 Defendant has moved to strike Plaintiff's assertion that Safeway was considering closing
21 Store No. 2088, arguing that Plaintiff lacks personal knowledge to make such a statement.

22 Store No. 2088 was one of the furthest stores in the district from Plaintiff's Payson
23 home. After his transfer to Store No. 2088, Plaintiff's commute increased from two hours
24 to four hours a day. However, when Plaintiff was transferred to Fountain Hills, he was in the
25 City Store circuit. Thus, he then became eligible to be assigned to manage any other City
26 Store.

27 Defendant's issue with Plaintiff's performance did not change after his transfer to Store
28 No. 2088. In fact, Mr. Peterson received complaints from several employees that Plaintiff

1  was coming in late, taking extended lunches, and leaving early. In 2003, during Plaintiff's
2  time as manager there, Store No. 2088's customer service score was 15th out of 16 stores in
3  Mr. Peterson's district.

4  On December 15, 2002, Plaintiff sent an email to Mr. Valenzuela and other members
5  of management and human resources expressing his desire to be transferred to a store closer
6  to his home in Payson. Plaintiff did not receive a response from Mr. Valenzuela. On several
7  subsequent occasions, Plaintiff expressed his desire to transfer to a store nearer his home in
8  Payson to Safeway management. Plaintiff's requests were not acted upon, despite openings
9  in several stores that Plaintiff had requested.

10 In January 2004, Plaintiff took medical leave to have foot surgery. Safeway
11 preliminarily designated Plaintiff's leave status under the FMLA as of January 2, 2004 and
12 requested a doctor's certification for the leave. Mr. Peterson requested that Plaintiff return
13 to work two days before his leave was scheduled to end. Plaintiff informed Mr. Peterson that
14 he intended to take additional leave in the future under the FMLA.

15 In March 2004, Safeway's Chief Executive Officer Steve Burd complained to Dan
16 Valenzuela, the president of Safeway's Phoenix Division about Store No. 2088's produce
17 department. The complaint was handed down to mid-level manager Steven Neibergall. Mr.
18 Neibergall instructed Mr. Peterson to meet with Plaintiff and devise a plan to re-merchandise
19 the produce department. Mr. Peterson, in turn, informed Plaintiff that he was under
20 inspection and that the produce department at Store No. 2088 needed to be "torn apart and
21 reorganized."

22 Mr. Peterson and Plaintiff prepared a plan to address the produce department. The
23 produce department was completely re-merchandised and cleaned. Approximately 100 work
24 hours were spent reorganizing and cleaning the produce department.

25 Mr. Neibergall personally visited Store No. 2088 and inspected the produce
26 department and observed that the produce department was "greatly improved." In March
27 2004, after the reorganization had been completed, Al Duran, the Director of Marketing for
28 Safeway's Phoenix Division at the time, visited Store No. 2088 for three consecutive days.

1  Mr. Duran expressed dissatisfaction with the appearance of the produce department. During
2  Mr. Duran's final visit, Mr. Valenzuela accompanied him. Mr. Duran expressed to Mr.
3  Valenzuela that Store No. 2088's produce department continued to experience quality issues
4  that needed to be corrected on a long-term basis. Mr. Valenzuela, Mr. Neibergall, and Mr.
5  Duran also expressed to Mr. Peterson their concern that Plaintiff may not be putting the right
6  amount of emphasis and effort into running the Store and the produce operation.

7  On March 23, 2004, after his meeting with upper management, Mr. Peterson went to
8  Store No. 2088 to meet with Plaintiff. Mr. Peterson told Plaintiff that he was going to have
9  to start working at 6:00 a.m. and work until 11:00 p.m. seven days a week for an indefinite
10 period, that management would be visiting his store on a daily basis, and that he should talk
11 things over with his wife and consider quitting. When Mr. Peterson allegedly told Plaintiff
12 he should consider quitting, Plaintiff reports that he interpreted Mr. Peterson's statement to
13 mean that his career at Safeway was over.

14 On March 24, 2004, the day after his meeting with Mr. Peterson, Plaintiff went out
15 on paid medical leave, which he remained on until June 12, 2004 – his last day as a Safeway
16 employee.

17 On June 4, 2004, Safeway's counsel sent Plaintiff's attorney a letter explaining that
18 Plaintiff would not have to work 17 hours a day or 7 days a week, and that Safeway was
19 expecting Plaintiff to return to work. At his deposition, Plaintiff admitted that when he read
20 the letter, he understood that Safeway wanted him to return to work. However, Plaintiff did
21 not return to his job at Safeway at any time after his March 23, 2004 meeting with Mr.
22 Peterson. Plaintiff testified that he had no intention to return to Safeway because he thought
23 his career with Safeway was over. Plaintiff obtained a job with Walgreens in April 2004 and
24 began working his new position with Walgreens on June 14, 2004.

25 Safeway utilizes a progressive disciplinary policy. Plaintiff reports that despite
26 Defendant's assertions that his performance was lacking, he was never placed on any
27 performance improvement plans, nor did he receive any progressive discipline.

28 LEGAL STANDARD

- 4 -

1     Summary judgment is properly granted when no genuine and disputed issues of 2 material fact remain, and when, viewing the evidence most favorably to the non-moving 3 party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56; Celotex 4 Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Eisenberg 5 v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.1987).

6     Initially, the moving party bears the burden of showing that there is no material factual 7 dispute. Therefore, the court must regard as true the opposing party's evidence, if supported 8 by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d 9 at 1289. The court must draw all reasonable inferences in favor of the party against whom 10 summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 11 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Intel Corp. v. Hartford Accident & Indem. 12 Co., 952 F.2d 1551, 1558 (9th Cir.1991).

13     The burden then shifts to the non-movant to establish the existence of material fact. 14 Celotex, 477 U.S. at 323, 106 S.Ct. 2548. The non-movant "must do more than simply show 15 that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 16 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 17 586-87, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)).

18     A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could 19 return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 20 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-movant's bare assertions, standing 21 alone, are insufficient to create a material issue of fact and defeat a motion for summary 22 judgment. Id. at 247-48, 106 S.Ct. 2505.

23 DISCUSSION

24 I.    AGE DISCRIMINATION CLAIM

25     Plaintiff asserts that Defendant discriminated against him because of his age. The 26 ADEA makes it "unlawful for an employer, . . . to fail or refuse to hire or to discharge any 27 individual [who is at least 40 years old] . . . because of such individual's age." 29 U.S.C. § 28 623(a)(1). To establish a *prima facie* case of discrimination, Plaintiff must show that: (1) he

1  is a member of a protected class; (2) he was performing his job in a satisfactory manner; (3) he was discharged; and (4) he was replaced by a substantially younger employee with equal or inferior qualifications or that he was discharged under circumstances giving rise to an inference of age discrimination. Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994).

"The amount [of evidence] that must be produced in order to create a *prima facie* case [of age discrimination] is 'very little.'" Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1111 (9th Cir.1991); A plaintiff need only present evidence which "gives rise to an inference of unlawful discrimination." Lowe v. City of Monrovia, 775 F.2d 998, 1005 (9th Cir. 1985). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Id. at 1005. If a defendant overcomes his burden, then, in order to prevail, the plaintiff must demonstrate by a preponderance of the evidence that the employer's alleged reasons for the adverse employment decision are a pretext for another motive which is discriminatory. Id.

Applying the test for a *prima facie* claim of discrimination under the ADEA, Plaintiff is over forty years of age and, therefore, meets the first prong of the test. Regarding the second prong of the test, Plaintiff asserts that he was fully qualified to hold the store manager position and that he was performing his job satisfactorily. In fact, Plaintiff provides numerous examples of awards and positive performance reviews he has received for between 1993 and 2002. Plaintiff also points out that in 2003 and 2004 he was not placed on either performance improvement plans ("PIP") or Service Improvement Plans ("SIP"), which are programs Safeway puts store managers on when a manager needs to improve his service or their performance is below certain benchmarks. Nor did his supervisor Mr. Peterson discuss with Plaintiff the possibility of putting him on a performance improvement plan. In fact, Plaintiff states that he was eligible for a merit increase based on his annual review at the time he stopped working for Safeway. Plaintiff has met his burden of proving a *prima facie* claim of age discrimination under the ADEA.

- 6 -

1    Regarding the third prong of the test, Plaintiff asserts that he suffered adverse
2  employment decisions first when he was involuntarily transferred to Safeway Store No. 2088
3  and, subsequently, when he was constructively discharged when his supervisor Mr. Peterson
4  told him he would be required to work seventeen hours a day, seven days a week in order to
5  keep his position.[1]  Plaintiff also asserts that the failure to transfer him to a store closer to his
6  home was an adverse employment action.

7    As stated above, Plaintiff has asserted that he was constructively discharged when Mr.
8  Peterson told him that he would be required to work seventeen hours a day, seven days a
9  week.  To show that he was constructively discharged, Plaintiff must show that his working
10 conditions were so discriminatory and intolerable when he resigned that any reasonable
11 person would have resigned under similar circumstances.  See Steiner v. Showboat Operating
12 Co., 25 F. 3d 1459, 1466 (9th Cir. 1994).

13   Defendant asserts that Plaintiff cannot prove that the working conditions were
14 unbearably discriminatory and intolerable *at the time he resigned* – June 12, 2004 – to prove
15 constructive termination.  Defendant makes this assertion in light of a letter that Safeway
16 sent to Plaintiff on June 4, 2004, explaining that Plaintiff had misinterpreted his meeting with
17 Mr. Peterson and that he would not be required to work seventeen hours a day, seven days
18 a week, and that Safeway wanted him to return to work.  Plaintiff admitted that when he read
19 the letter, he understood that Safeway wanted him to return to work.

20   In light of Mr. Peterson's comments purporting unrealistic demands to Plaintiff on
21 March 23, 2004, it is conceivable that Plaintiff's working conditions were so discriminatory
22 and intolerable that a reasonable person would have resigned under similar circumstances.
23 But, as Defendant points out, Plaintiff did not resign until June 12, 2004.  In the mean time,
24 Safeway's counsel sent a letter to Plaintiff's attorney stating that Plaintiff would not have to
25 work 17 hours a day or 7 days a week, and that Safeway was expecting Plaintiff to return to

---

[1] Plaintiff asserts that Mr. Peterson told him that he would be required to work from 6:00 a.m. to 11:00 p.m., seven days a week for an indefinite period of time.

- 7 -

1 work. However, Safeway's counsel's letter did not indicate what Plaintiff's work-life would
2 be like if he were to return to work. It did not lay out what Plaintiff's work schedule would
3 be, it did not state whether Plaintiff would remain under intense managerial scrutiny, nor did
4 it negate Mr. Peterson's remark that Plaintiff should "talk things over with his wife and
5 consider quitting." Thus, even though Plaintiff admitted that after he read the letter from
6 Safeway, he understood that Safeway wanted him to return to work, the Court finds it
7 conceivable that Plaintiff's working conditions remained so discriminatory and intolerable
8 that a reasonable person would have resigned under similar circumstances. Therefore, the
9 Court finds that Plaintiff has met the third prong of the test.

10       To meet the fourth prong of the test, that Plaintiff was replaced by, or discharged and
11 replaced by, a substantially younger employee with equal or inferior qualifications.
12 Generally, Plaintiff asserts that Safeway has a culture of moving older store managers to
13 stores further away from their homes in an effort to force them to quit. Plaintiff states that
14 he has observed this practice for years. Specifically, Plaintiff alleges that he was replaced
15 by – or passed over for positions in favor of – younger, less experienced candidates. Plaintiff
16 contends that when he was involuntarily transferred from Fountain Hills to Store No. 2088,
17 he was replaced by Kevin Wehrly, who is approximately eleven years younger than Plaintiff
18 and had only a few years of store management experience.[2] Plaintiff further contends that
19 while he was working at Store No. 2088, he requested a transfer to the store at Frank Lloyd
20 Wright and Via Linda. Plaintiff did not get the position. Instead, the position was given to
21 a younger assistant manager who Safeway promoted to manager when it gave her the
22 position. Thus, Plaintiff has met all four prongs of the test to assert a *prima facie* claim of
23 discrimination under the ADEA.

24       Next, the burden shifts to Defendant to show a legitimate nondiscriminatory reason
25 for its employment decision. Defendant contends that Plaintiff was transferred to Safeway

---

[2] At that time, Plaintiff had approximately fifteen years of store management experience.

- 8 -

1  Store No. 2088 due to poor performance at the Fountain Hills store. Defendant provides the
2  deposition of Mr. Peterson to show that Plaintiff was being transferred because his overall
3  performance was not good enough, specifically Plaintiff's service scores were poor.
4  Furthermore, Defendant asserts that the produce department at Store No. 2088 was not
5  performing satisfactorily. Defendant has met its burden to show a legitimate
6  nondiscriminatory reason for its decision to transfer Plaintiff to Store No. 2088.

7  Finally, the burden shifts back to the Plaintiff to show that the reasons Defendant has
8  offered are pretextual. Plaintiff points out that despite Defendant's assertion that Plaintiff had
9  poor service scores, there is no evidence that he received progressive discipline for any
10 alleged customer service short-comings. Further, Plaintiff contends that, despite Defendant's
11 argument that Plaintiff was involuntarily transferred to Safeway Store No. 2088 due to poor
12 performance, a few weeks before his transfer, the Arizona division complimented Plaintiff
13 on his store and called him "Super Dave." Not only was Plaintiff transferred involuntarily,
14 he was transferred to what he has called "one of the worst stores in the district that Safeway
15 was contemplating closing."[3] Moreover, when Plaintiff was told that he would need to
16 increase his hours because of problems with the produce department at Store No. 2088, Mr.
17 Peterson could not tell Plaintiff specifically what was wrong with the produce. Plaintiff
18 asserts that Mr. Peterson's alleged ultimatum that, to keep his job, Plaintiff would be required
19 to work seventeen hour days, seven days a week, was absurd and humanly impossible.
20 Plaintiff asserts that Safeway managers uniformly agree that a reasonable person would be
21 justified to quit if faced with the ultimatum Plaintiff was faced with. Plaintiff asserts that
22 Defendant transferred him to Store No. 2088 and gave him the ultimatum because they
23 wanted to force Plaintiff out of the company and replace him with a younger manager.

---

[3] In its Motion to Strike portions of Plaintiff's Objections and Controverting and Separate Statement of Facts in Support of Plaintiff's Response in Opposition to Safeway's Motion for Summary Judgment, Safeway moves to strike Plaintiff's statement that Safeway was considering closing Store No. 2088. Safeway asserts that Plaintiff lacks personal knowledge to make such a statement.

- 9 -

1 Plaintiff has met his burden of demonstrating by a preponderance of the evidence that
2 the employer's alleged reasons for adverse employment decision are a pretext for another
3 motive which is discriminatory. Lowe 775 F.2d at 1005. Therefore, Defendant's Motion for
4 Summary Judgment is denied with regard to Plaintiff's Age Discrimination claim under the
5 ADEA.

6 II.     WRONGFUL CONSTRUCTIVE TERMINATION CLAIM

7 The Employment Protection Act ("EPA") "whistleblower" provision prohibits an
8 employer from terminating an employee in retaliation for an employee's disclosure "in a
9 reasonable manner that the employee has information or a reasonable belief that the
10 employer, or an employee of the employer, has violated, is violating or will violate the
11 Constitution of Arizona or the statutes of this State. . . ." A.R.S. § 23-1501(3)(c)(ii).  To
12 establish this claim, Plaintiff must demonstrate that he reported what he reasonably believed
13 to be a violation of Arizona law and that Safeway terminated him for reporting the alleged
14 violation. Id.

15 Plaintiff asserts that Defendant wrongfully terminated him for his alleged
16 whistleblowing activities under the EPA. Specifically, Plaintiff claims the following two acts
17 fall under protected activity. First, Plaintiff reported that the Payson store manager[4] was
18 falsifying company records by reporting the use of training hours and sick hours that had not
19 been legitimately or actually used to meet the store's weekly budget. Next, Plaintiff reported
20 that managers at Safeway stores with fuel stations were not being fairly credited in terms of
21 store gain for bonus calculation purposes. Plaintiff asserts that these reports constituted
22 protected activity because he reasonably believed that the law had been violated, and because
23 he was constructively discharged because of the reports.

24 Defendant points to Plaintiff's deposition to argue that at the time Plaintiff made the
25 reports, he did not reasonably believe that he was reporting an illegal activity. At his

---

[4] This was Plaintiff's replacement at the Payson Safeway Store after Plaintiff was transferred to Fountain Hills Safeway.

- 10 -

1  deposition, Plaintiff stated that he had reported the violations because they were against
2  Safeway policy. Plaintiff also stated that he *did not know* whether the violations were also
3  against federal or state law. Plaintiff asserted that he knew that the violations were against
4  Safeway policy and that some of Safeway's policies mirror federal and state laws. Plaintiff
5  is not required to *know* whether the violation is illegal.

6  Plaintiff cites Murcott v. Best Western International, Inc., 198 Ariz. 349, 9 P.3d 1088
7  (App. 2000), to argue that it is irrelevant whether Plaintiff knew if a law had been violated.
8  Plaintiff also contends that how he characterized the activities is irrelevant. What is relevant,
9  Plaintiff asserts, is that he knew that some of Safeway's policies are based on labor laws,
10 therefore, he reasonably believed that the violations of Safeway policy he was reporting also
11 could have violated federal or state law.

12 In Murcott, 198 Ariz. at 357, 9 P.3d at 1096, the Arizona Supreme Court described
13 a whistle-blower as an employee "who exposes wrongdoing on the part of *employer*, and is
14 then discharged." (citing Wagner v. City of Globe 150 Ariz. 82, 88, 722 P.2d 250, 256
15 (1986)) (emphasis added). Here, Plaintiff reported violations performed by *fellow*
16 *employees*. Furthermore, by filing his reports with Safeway, Plaintiff actually saved Safeway
17 money by exposing employee-wrongdoings. There would be no reason for Safeway to
18 terminate Plaintiff for saving the Store money.

19 Defendant also asserts that Plaintiff has not made a *prima facie* showing that Safeway,
20 in fact, terminated Plaintiff, nor that any such termination was done because of the reports
21 Plaintiff had filed. If the moving party shows an absence of evidence to support the
22 non-moving party's case, the burden then shifts to the non-moving party to produce "specific
23 evidence, through affidavits or admissible discovery material,to show that the dispute
24 exists." Bhan v. NME Hosps. Inc., 929 F.2d, 1404, 1409 (9th Cir. 1991). The Court finds no
25 reason nor any evidence that Safeway terminated Plaintiff because he filed the above-
26 described reports. Nor does Plaintiff provide definitive proof of such. Instead, Plaintiff
27 argues that Plaintiff's termination due to his filing the reports can be inferred from the close
28

- 11 -

1 proximity of time between filing the reports and his constructive termination less than six
2 months later.

3 The Court finds Plaintiff's argument for an EPA violation lacks merit as the reports
4 are not sufficient for a valid report against an employer as required under the EPA and the
5 correlation to his constructive termination six months later is too tenuous. Therefore, the
6 Court finds that Plaintiff has not met his burden of proving a *prima facie* case of wrongful
7 termination. Therefore, the Court grants Defendant's Motion for Summary Judgment with
8 regard to Plaintiff's wrongful termination claim and dismisses this claim.

9 III.     FAMILY MEDICAL LEAVE ACT CLAIM

10 The FMLA entitles qualifying employees to take unpaid leave for up to 12 weeks each
11 year provided they have worked for the covered employer for 12 months. 29 U.S.C. §
12 2612(a). To survive summary judgment, an employee who claims that his employer
13 terminated him in violation of the FMLA must prove a *prima facie* case of wrongful
14 discharge by a preponderance of the evidence. Liu v. Amway Corp., 347 F.3d 1125 (9th Cir.
15 2003). Therefore, a plaintiff must raise a genuine issue of material fact as to the following
16 three elements of his *prima facie* case: (1) he took FMLA leave; (2) he suffered an adverse
17 employment decision; and (3) the adverse decision was causally related to his leave.

18 Plaintiff claims that Defendant violated the Family Medical Leave Act ("FMLA")
19 when Mr. Peterson purportedly required Plaintiff to return from the leave that he took in
20 January and February 2004 – two days earlier than his scheduled return date. Plaintiff also
21 claims that Mr. Peterson constructively terminated him because Mr. Peterson knew that
22 Plaintiff intended to take time off under the FMLA again in the future. Defendant contends
23 that the leave Plaintiff took in January 2004 was not under FMLA and, furthermore, Plaintiff
24 cannot base an FMLA claim on the possibility that he is going to require FMLA leave in the
25 future.

26 The FMLA provides that an employee "shall provide, in a timely manner, a copy of
27 . . . certification [of his eligibility for leave under the FMLA] to the employer." 29 U.S.C. §
28 2613(a). Plaintiff has not met this requirement.

- 12 -

As stated above, Plaintiff has asserted that he was forced to return to work two days before his leave was scheduled to end. However, Defendant contends that it originally categorized Plaintiff's leave under the FMLA but subsequently change its categorization to non-FMLA leave. It asserts that it made this revision because Plaintiff did not provide medical certification that Safeway requested to qualify him for coverage under the FMLA. Pursuant to 28 C.F.R. § 825.311(b), Safeway sent a letter to Plaintiff on January 23, 2004 requesting a doctor's certification supporting Plaintiff's eligibility for leave under the FMLA. The letter also advises that if Plaintiff does not supply the requested documentation within 15 days of his receipt of the letter, his leave will be reclassified outside the scope of the FMLA. Plaintiff did not comply with the letter.

Plaintiff also argues that Defendant violated the FMLA because he intended to seek FMLA leave in the future. However, Defendant correctly asserts that a valid FMLA claim must be based on FMLA leave already taken. Plaintiff's FMLA argument based on future events is not sufficient.

As noted above, the Court has found that Plaintiff has successfully shown an adverse employment decision (see I above), thereby meeting the second prong of the test for a valid claim of FMLA violation. However, the Court finds that neither of Plaintiff's assertions that he took FMLA satisfy the first prong of the test for a *prima facie* FMLA violation claim. Without meeting the first prong, it is not possible for Plaintiff to meet the third, causation, prong. In other words, the Court finds that Plaintiff has not provided sufficient evidence to prove the first and third prong of a *prima facie* case of an FMLA violation. Therefore, the Court grants Defendant's Motion for Summary Judgment with regard to Plaintiff's claim of an FMLA violation and dismisses this claim.

IV. DEFENDANT'S MOTION TO STRIKE AND PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUPPLEMENT AFFIDAVIT

Defendant has moved to strike evidence Plaintiff submitted in his Objection to its Motion for Summary Judgment (Dkt. # 58). In response, Plaintiff has filed a Motion for Leave to File a Supplemental Affidavit (Dkt. #61). To the extent the Court relied upon

1  evidence to which Defendant has moved to strike, Defendant's Motion is denied. To the
2  extent the Court did not rely on such evidence, the Defendant's objections are overruled as
3  moot. Plaintiff's Motion for Leave to File a Supplemental Affidavit is denied as moot.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Court grants in part and denies in part Defendant's Motion for Summary Judgment (Dkt. # 48) in accordance with this Order.

**IT IS FURTHER ORDERED** that the Court denies in part and denies as moot Defendant's Motion to Strike (Dkt. #58).

**IT IS FURTHER ORDERED** that the Court denies as moot Plaintiff's Motion for Leave to File a Supplemental Affidavit (Dkt. #61).

DATED this 10th day of March, 2007.

_____
Mary H. Murguia
United States District Judge